PENT v. The CONCORDIA. See Case No. 3,092.

## Case No. 10,961.
### PENT et al. v. The OCEAN BELLE.[1]
District Court, S. D. Florida. Jan., 1861.

SALVAGE COMPENSATION—HOW DETERMINED—DISTRIBUTION.

[1. Salvage is a reasonable compensation; an adequate reward for saving property, and not any definite proportion of the value saved. The reasonableness of the compensation depends upon a full and fair consideration of time, place, labor, danger, value, and number of salvors who performed or were necessary to perform the salvage service.]

[2. What would be no more than reasonable salvage on the coast of Florida, where so many wrecks occur, and where the assistance of so few transient vessels can be had, and where consequently the employment of so many wrecking vessels has been found necessary, might be unreasonably large in the neighborhood of commercial ports, where wrecks are fewer, and passing vessels numerous.]

[3. Salvors are entitled of right only to a reasonable compensation for work and labor, and no injustice is done them if any reward beyond this is withheld. Such additional reward is not made on account of the salvors at all, but purely for the good of commerce in general, to encourage others to save property in like peril.]

---

1 [Not previously reported.]

[4. In places where wrecking is a business, and salvors engage therein more from interest than humanity, the scale of salvage awards should be so adjusted as that it will never be to the interest of a salvor that a ship should be lost, and that it should always be to his interest that she should be saved in a condition as little damaged as possible.]

[5. Where a ship laden with cotton, stranded near Marquisas Island, 30 miles from Key West, was gotten off, in good weather, by the aid of 8 wrecking vessels, aggregating 481 tons, with 64 men, and a steam propeller of 450 tons, with 21 men, after lightening her of 1,140 bales of cotton, and was then towed around an extensive shoal about 70 miles, to the harbor of Key West, held, that $17,000 should be allowed upon an aggregate valuation of $165,000, it appearing that, had the weather been bad, the ship, from her exposed situation, would have been in great peril of total loss.]

[6. Licensed wrecking vessels are entitled to be admitted to assist in the order in which they arrive, if further assistance is needed; and, if some are excluded, and a vessel arriving after them, is permitted to render assistance which they could have rendered, they will be permitted to share in the salvage; but they are not entitled to an equal share with the others, and they should be awarded only so much as, under all the circumstances, the court may think them equitably entitled to, and so much as will make it to the interest of the wreckers to conform to the rule above stated.]

[This was a libel by James Pent and others against the ship the Ocean Belle and cargo to recover salvage for services rendered.]

W. C. Maloney, for libel.

S. J. Douglas, for respondent.

MARVIN, District Judge. This ship, laden with 3,048 bales of cotton, bound from New Orleans to Liverpool, ran ashore near Marquisas Island, situated about thirty miles to the westward of this place, on the morning of the 6th of January, 1861. Learning that the ship was ashore, eight wrecking vessels, of the aggregate tonnage of 481 tons, carrying in all sixty-four men, and a steam propeller of the burthen of 450 tons, carrying twenty-one men, proceeded from this port to her assistance, and, after carrying out an anchor, lightened the ship of 1,140 bales of cotton, when, by heaving at the windlass, and tugging by the steamer, the ship came off the reef. She was then towed around an extensive shoal, and brought to this place. She was towed in all about seventy miles. The weather was good, and the ship sustained but little damage while ashore, so that the ship is in a fit condition to proceed on her voyage without being discharged or repaired. Had the weather been bad, her exposed situation would have subjected her to great peril of total loss. The value of the ship, for the purpose of determining the question of salvage, may be estimated at $30,000, and the cargo at $135,000, making the aggregate $165,000. The questions to be decided are, what amount of compensation ought to be allowed for the services rendered in saving the ship and cargo, and how shall the sum allowed be divided among the salvors?

As to the first question, the law has long since been settled in England and the United States that salvage is a reasonable compensation; an adequate reward for saving property exposed to marine peril, and not any definite proportion of the value saved. The reasonableness of the compensation must, in the nature of the case, depend upon a full and fair consideration of all the circumstances of time, place, labor, danger, value, and number of salvors who performed, or were necessary to perform, the salvage service. What would be no more than reasonable on this coast, where so many shipwrecks occur, and where the assistance of so few transient or trading vessels can be had to save the property, and where, consequently, the employment of a number of regular wrecking vessels has been found necessary for that purpose, might be unreasonably large in the neighborhood of commercial ports, or on the coast of England or the United States, or in any place where regular wrecking vessels were unnecessary, because wrecks were fewer, and the assistance of transient persons or vessels could be more easily obtained. But there must be a limit to the augmentation of the rates of salvage for services rendered on this coast, and that limit will be more clearly seen by adverting to the reasons which the law assigns for allowing salvage in any case for services rendered on any other sea or coast. Persons engaging in the business of wrecking are very apt to acquire a habit of thinking that they are entitled of right to a reward for saving property,—to something more than common pay for common labor. And when that reward is withheld from them, or is not so large as they think it ought to be, they think great injustice is done them. Whereas the truth of the matter is, according to all the leading cases on the law of salvage in England and the United States, salvors are entitled of right to a reasonable compensation for work and labor only; and no injustice is done them when they are paid this, and the reward is withheld. The reward—or the excess beyond pay for work and labor—is not awarded to them on their own account at all, but purely on account of commerce in general, to encourage others to save property in the like peril. If persons would as readily and voluntarily save property on the sea as they do on shore from a burning house, no salvage would be decreed by the courts in the one case any more than in the other. Mason v. The Blaican, 2 Cranch [9 U. S.] 240; The Sarah, 1 C. Rob. Adm. 312, note; The Hector, 3 Hagg. Adm. 95. From this view of the subject, it follows that salvages ought never to be graduated at higher rates than the good of commerce really requires; and whenever it appears that more vessels and men are employed in the business of saving property than the good of commerce truly requires, it is evident that the rates of salvage

have been too high,—too stimulating,—and the court should at once be admonished that the good of commerce required that they should be reduced. Commerce may be damnified by too high salvages, not only by being subjected to their payment, but also by increasing the inducement to salvors to collude with shipmasters with a view to the acquisition of such salvages. It is believed that no vessel or cargo has been lost on this coast in many years in consequence of an insufficient supply of wrecking vessels and men to save them. This fact is evidence that the salvages have been sufficiently high for the good of commerce. We have no evidence that they have not been too high; and whether they may not be somewhat reduced and graduated on a lower scale to the advantage of commerce is a question worthy of the very serious consideration of the court. That the interests of persons engaged in the wrecking business cannot be promoted by high rates of salvage, is perfectly obvious to the mind of every impartial and disinterested person. High rates of salvage induce a large number of persons to engage in the business and share its profits. An increase in the number of the sharers diminishes the share of each, in like manner as an increase in the divisor diminishes the quotient. A further increase in the salvages would have the same effect. A progressive series of augmentations in the rates of salvage would end in taking the whole property saved for the salvage, and in collecting a large number of persons upon the coast, dependent upon shipwrecks for their living, whose individual annual shares, on account of their increased numbers, would be no larger than shares of a less number, receiving only salvages graduated on a moderate scale. The interests of the professional salvor cannot, in the long run, be promoted by high rates of salvage; and his interests, when rightly understood, will always be seen to be in harmony with the interests of commerce. Both are best secured, in the long run, by moderate salvages.

We will now advert to number of cases, by way of showing what have been the usual rates of salvage decreed by this court. We shall select the cases indifferently from the two classes: First, from that when the vessel was saved; and, second, where it was lost. The Ellen Hood [Case No. 4,377] was decided in 1855. That ship ran ashore to the northward of Cape Florida, about 150 miles from this place. She was laden with 3,039 bales of cotton. Ten wrecking vessels, carrying in all eighty men, lightened her of 961 bales, heaved her off, and brought her to this port. The ship and cargo were valued at $192,391. The court decreed $20,500 for salvage. The Courier [Id. 3,283], laden with 3,024 bales of cotton, got ashore on Carysfort Reef, and lay in an exposed situation. The master carried out his own anchors, after which the weather became bad, and the crew insubordinate. Six wrecking vessels, carrying sixty-two men, carried out another anchor, lightened the ship of 900 bales, and heaved the ship off. They were employed several days in performing the service, the weather being too bad to work. The ship and cargo were valued at $140,000, and $19,000 were decreed for salvage. The case of Roberts v. The Ocean Star [Id. 11,908] was decided in 1860. This ship, laden with 2,590 bales of cotton, went ashore on the outer side of Brewster Reef,—a dangerous reef situated near Cape Florida. Four wrecking vessels and a number of fishing boats, possessing an aggregate tonnage of 401 tons, and carrying 67 men, carried out three anchors, and lightened the ship of 583 bales. The master left the ship as soon as the first wrecking vessel was loaded (very improperly, as the court thought) to go to Key West to make arrangements with his consignee. The ship was in a very dangerous situation, demanding the utmost care and skill to extricate her. The wreckers exercised both, and saved the ship and cargo. She leaked badly, requiring constant pumping on her way to this port. The ship and cargo were valued at $106,000; salvage, $16,500; seamen's shares, $95. The Maria Pike [Id. 9,081], laden with cotton and molasses, ran ashore on North Key Flats, one of the Tortugas Shoals. Three smacks, carrying twenty men, went to her assistance. They found the master employed in staving his deck load of molasses to ligthen the vessel. She was lying easy, but surrounded with intricate and extensive shoals. On the arrival of the smacks the master ceased the business of staving the casks of molasses, and the next morning forty barrels of molasses were put on board one of the smacks, and, sail being made, she went off the reef into deep water by an inner channel known to the salvors, but unknown to the master. Considerable skill and good judgment were displayed by the salvors in managing the sails to get the vessel clear of the shoals, and in subsequently piloting the vessel through the channel out to sea. The master could have got the vessel afloat by throwing overboard the forty barrels of molasses, but he could not have got her out of her difficulties without a pilot. The court said: "The chief value of the services consisted in the piloting, which very likely was the means of saving the vessel and cargo." The value of vessel and cargo was estimated at $32,000; the salvage was $3,200; shares, $65. The Laura Russ [Id. 8,120] was stranded on Alligator Reef in 1860, laden with an assorted cargo. Two wrecking vessels and several boats, carrying in all twenty-eight men, carried out two anchors, and partly loaded one of the vessels. They then heaved her off, warped her some distance into deep water, and brought her to this port. Value $24,000; salvage, $3,000. In the case of The Pilgrim [Id. 11,166], two wrecking vessels and eighteen men carried out an anchor and heaved

the vessel off the American Shoal. Value, $16,000; salvage, $1,500. The Calcutta [Id. 2,298], valued at $60,000 was piloted from the Washerwoman Shoal where she lay in a perilous situation, into Key West, and $1,500 was decreed for the service.

In the following cases the vessels were lost: The Eliza Mallory [Case No. 4,365] was wrecked in 1860, on the coast north of Cape Florida, laden with 4,923 bales of cotton, weighing 180 pounds each. Twelve wrecking vessels were employed various and different lengths of time—some one week, some five—in saving the cargo. The water in the ship came up about two feet over the lower deck, so that all the cotton saved from the lower hold was saved by diving, but the diving was attended with less difficulty than is usual in cases where the bales are larger. The whole cargo saved was valued at $56,445. The total salvage allowed was $16,241. The rates of salvage were one-fifth on the dry, one-third on that partly wet, and two-fifths on that saved by diving; one-third was allowed on the stores and materials. The shares varied from $21 to $77. The Crown [Id. 3,450], laden with cotton and grain, was lost on Ajax Reef in 1857. Fifteen vessels, possessing an aggregate tonnage of 1,161 tons, carrying 152 men, saved cotton, grain, and materials to the value of $131,000. The salvage was $23,000; the seamen's shares $70. The Yucatan [Id. 18,194], was lost near Cape Florida, laden with an assorted cargo. Nine large wrecking vessels were employed to save the cargo. Forty-three per cent. was allowed for salvage, which made the average shares $62. The Brewster [Id. 1,852] was lost near Cape Florida, laden with cotton. The cargo was saved by twelve vessels carrying 133 men. The salvage was one-third. Shares $50. Where the value of the cargo and materials saved has been comparatively small, and more than one or two wrecking vessels have been employed, the court has been in the habit of allowing forty-five and fifty per cent. for salvage, in order to compensate for the labor; as in the case of The Nathan Hanan [Id. 10,029], where the value saved was $4,554.39, forty-five per cent. was allowed; and in The Thales, where the value was $2,105, one-half was allowed. The most usual rate of salvage, in this court, for saving cotton where the ship was lost, has been twenty-five per cent. on the dry, forty per cent. on the wet saved without actual diving, but taken out from under the water, and fifty per cent., and, in some few instances, fifty-five and sixty per cent., for saving it by diving in the lower hold, as in the cases of The Mulhouse [Id. 9,910], The Indian Hunter [Id. 7,024], The Mary Coe [Id. 9,204], The Cerro Gordo [Id. 2,557], and others.

It is to be remarked in regard to these two classes of cases—first, where the vessel was lost, and, second, where it was saved—that the shares of the individual salvors have, for many years past, in this court, been quite as large in the cases where the vessel was saved, other things being equal, as where it was lost. In some few instances, where a large number of salvors were employed, the aggregate salvage may have been larger where the vessel was lost; but the individual shares in such cases will be found generally to have been less than in most cases where the vessel was saved.

It will be found, too, on looking into the cases on file in the clerk's office, that the court has always judged of the peril by the circumstances of the situation of the ship on the reef, depth of water around her, the winds, tides, &c., more than by the condition of the ship after she had been got off. A chafed or ground keel or bottom, or a leak in the ship, may be evidence of a want of honest persevering exertions on the part of the salvors to relieve her before such damage occurred, as well as evidence of her perilous situation while on the reef. Ships are to be saved, not lost. And the same motive of policy which authorizes the giving of salvage in any case requires on this coast, where wrecking is a business, and the salvor is such more from motives of interest than humanity, that the scale of salvages should be so adjusted as that it shall never be the interest of a salvor that a ship should be lost, but, on the contrary, that it should be saved in a condition as little damaged as possible. I know, from observations of the past, that this policy often thwarts the wishes of the master of the ship, who too often prefers, on account of the insurance, that his ship should be lost. But it is the duty, and the court makes it the interest, of the wreckers of this coast to save the ship, when it is possible, and not to collude with the master in such cases. If the assistance of wreckers is taken any time before the actual bilging of the ship, they are to be held accountable for carrying out anchors in due time, and planting them in the right places, and for the strength and security of their hawsers and chains, and generally for the safety of the ship, unless they show by the facts of the case that it could not be saved, or that the master prevented its being saved. The salvor claims salvage on the ground of meritorious services, and he must show merit. There is but little merit in saving a cargo, or a part of a cargo, when the salvor had it in his power to save the ship, but did not. To encourage the salvor, then, to do his duty, and to harmonize his duty with his interest, as far as is right, he should be well paid when he saves the ship, and more poorly paid when the ship is lost, even without his fault. See remarks on this subject in [Marvin on] "Wreck and Salvage" (section 110, and note, and section 107).

Returning now to the particular case before the court for consideration, and comparing it with the cases of The Ellen Hood, The Courier, and The Ocean Star, already

referred to, I think that seventeen thousand dollars is a reasonable salvage to all the salvors for the whole service. It remains to divide this sum among the salvors. It is a common usage of courts of admiralty both in England and the United States to divide the sum decreed for salvage among the salvors according to their respective merits, or a just and valid agreement of consortship, and to ascertain the share of each. The observance of this usage is particularly important where wrecking is a business, in order to protect the just rights of the weak and ignorant among the salvors themselves, and, in order to prevent sums in the way of gifts or bribes being deducted from the amount and given to the master of the wrecked vessel before it is divided into shares, which might occur when such division is not made under the supervision of the court, the clerk pays into the hand of each salvor his share.

In the present case the eight wrecking vessels first at the ship had carried out an anchor and lightened the ship of about 800 bales of cotton before the steamer came up. The steamer was then employed, and they all labored together in lightening the ship. Nine hundred and forty-eight bales were put on board the wrecking vessels, and 192 bales on board the steamer. The principal labor had been performed by the first set of salvors, before the steamer arrived, and they would undoubtedly have saved the ship without her services. But her services were valuable in getting the ship off the reef, and in towing her into port. I think that thirteen thousand one hundred dollars should be allowed to the eight wrecking vessels and crews, which, when divided among them according to the usual mode, by allowing the vessels one-half, the masters three shares, the mates two, and the seamen one, will make the seamen's share about seventy dollars. There should be allowed to the steamer two thousand one hundred dollars, and sixty dollars for a proctor's fee, which, considering the extraordinary expenses of running steam vessels, as compared with sail vessels, and the fact that her crew were at the time of rendering the service on wages, ought to be divided by allowing the owner $1,721 and the crew $379. This latter sum should be divided among the crew by allowing the master $50, the pilot $50, the mate and two engineers each $25, and the rest of the crew each $12. These sums are in addition to their wages. There still remains $1,737, part of the $17,000 allowed for the total salvage, to be disposed of. This brings me to the consideration of some features of the case not hitherto noticed. Five smacks of the aggregate burthen of 188 tons, and carrying in all thirty-two men, arrived at the ship a day after the eight wrecking vessels and a day or two before the steamer. They were at the ship, tendering their services, at the time the steamer was employed. They

claim that they were entitled to be employed before the steamer, that they were unjustly excluded from rendering salvage services, and are equitably entitled to a distributive share of the salvage earned. The rule of the high court of admiralty on this subject seems to be that all persons coming up together, or about the same time, to render assistance to a ship in distress, are entitled to share in the salvage, although a part only are actually employed. The Mountaineer, 2 W. Rob. Adm. 7. The rule in this court is: "That licensed wrecking vessels are entitled to be admitted to assist at a wreck or ship in distress, in the order in which they arrive, if further assistance is needed, unless some good cause exists for the contrary; and the master of any wrecking vessel, deeming his vessel and crew excluded without sufficient cause, is at liberty to apply to the court, by petition for a distribution share of the salvage." This rule is obviously just in itself, and sound in policy. It prevents disorders and quarrels at wrecks, and takes away from the first boarder or master wrecker the power, by colluding with the master of the ship, to extort hard terms from those that arrive after him. Before the adoption of this rule and its enforcement by several decisions, it was not uncommon for the first boarder or master wrecker to agree with the master of the ship to give him a portion of the salvage, on condition that the former should be allowed to select the vessels to be employed. The master wrecker being in this way submitted pro hac vice master of the ship, and the real master corrupted, it was an easy matter to extort from the wreckers who subsequently arrived any terms touching the division of the salvage the former might impose. But the right to be employed in the order in which the vessels arrive being now protected by the court, and the salvage decreed being divided and paid out by the court, no such opportunity of extortion from the other salvors or corruption of the master exists. It is to be observed however, that neither the rule nor any decision of the court interferes with the right of the master to employ one wrecking vessel in preference to another. Its effect is to protect him against an attempt by any wrecker to corrupt him, by taking away the inducement, and he is left every way free to employ any vessel he pleases. But when the wreckers come before the court to recover their salvage, he can properly have no interest beyond the amount to be decreed for the whole service. With the distribution of that amount among the salvors he has no concern. If no improper influences are brought to bear upon him, he will ordinarily employ the wrecking vessels, if adapted to the service required, in the order in which they arrive, for this is obviously just; and if he employs them in any other order, unless his reasons for doing so are satisfactory to the court, it may fairly be inferred that improper influences have

been exerted upon him by some of the salvors to the disadvantage of others. Such improper influences are not to be tolerated.

In the case before the court it is obvious that the employment of the steamer was proper and judicious. She could perform a service, and did perform a service, which the excluded vessel could not. But they could have lightened the ship of the 192 bales of cotton as well as she, and, pro tanto, their claim is founded in equity, and is fairly within the rule of the court and the decision of this court in the case of The Gutherie. But neither the rule nor any decision of the court recognizes the right of the excluded vessels to an equal share of the salvage; but to such a share as, under all the circumstances, the court may think they are equitably entitled to, and such as will, under ordinary circumstances, make it the interest of the wreckers, so far as they are concerned, to conform to the rule. I think it is equitable in the present case to allow the five smacks the $1,737 unappropriated. They remained at the work several days, under circumstances that indicated that their services would be needed, when their time, too, could have been profitably employed in fishing. This allowance is not an addition to what would have been the salvage had they not been there, but it is allowed them from what would otherwise have gone to the other salvors. The total salvage has not been increased on their account. Decree accordingly.